UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ALEJANDRO GALLEGOS,
CDCR #T-63165,

                                    Plaintiff,

vs.

K. SEELEY, M..D.,

                                    Defendant.

Case No.:  3:18-cv-01322-JAH-MSB

**ORDER DENYING DEFENDANT
SEELEY'S MOTION FOR
SUMMARY JUDGMENT
PURSUANT TO
Fed. R. Civ. P. 56**

**[ECF No. 32]**

        Currently before the Court is a Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 by Defendant K. Seeley ("Seeley") (ECF No. 32). After he was notified of the requirements for opposing summary pursuant to *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998) (ECF No. 34), Plaintiff filed his Opposition ("Opp'n") (ECF No. 736). Seeley has filed his Reply.  (ECF No. 37.)

        While the Motion was initially calendared before Magistrate Judge Michael S. Berg, the Court has determined that this Motion is  suitable for disposition upon the papers without oral argument and that no Report and Recommendation from Magistrate Judge Berg is necessary.

/ / /

For the reasons explained, the Court **DENIES** Defendant's Motion for Summary Judgment.  (ECF No. 32.)

## I.      Procedural Background

On June 18, 2018, Plaintiff filed a Complaint under 42 U.S.C. § 1983 alleging that Seeley violated his Eighth Amendment right to adequate medical care when he was previously incarcerated at Centinela State Prison ("CEN") in 2016.  (*See* ECF No. 1.)  On July 17, 2018, the Court granted Plaintiff leave to proceed in forma pauperis ("IFP"), screened his Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A, and directed U.S. Marshal service on his behalf. (*See* ECF No. 3.)  Defendant Seeley filed an Answer to Plaintiff's Complaint on October 11, 2018.  (*See* ECF No. 7.)

## II.     Plaintiff's Claims & Evidence[1]

In 2016, Plaintiff was housed at Centinela State Prison ("CEN").  (*See* ECF No. 1 at 4.)  Plaintiff "suffered from proliferative diabetic retinopathy with a non-clearing hemorrhage in his right eye."  (*Id.*)  Plaintiff claims he also was diagnosed with a "visually significant cataract that decreased his vision and precluded a view to the posterior segment."  (*Id.*)

Plaintiff was "scheduled for cataract extraction by phacoemulsification with intraocular lens implantation" in his right eye.  (*Id.*)  Plaintiff "underwent eye surgery" on January 8, 2016 at the "UC San Diego Health System."  (*Id.*)  "Following surgery, Plaintiff was returned to [CEN]."  (*Id.*)

Two days after his surgery, as he was being "processed" through the CEN "Triage and Treatment Area (TTA)", Plaintiff was "informed by health care staff that, pursuant to instructions and orders of Dr. K. Seeley, Plaintiff was to maintain a face down position for the next three days."  (*Id.*)  In addition, Plaintiff was "informed that, per directions of Dr. Seeley, any and all future transports between [CEN] and the UC San Diego Health

---

[1] These allegations are those set forth in Plaintiff's Complaint.  .

System were to be made in such a manner that an altitude of 2,000 feet would not be exceeded." (*Id.*) If these instructions were not followed, it "could result in the surgery not being successful." (*Id.*)

During Plaintiff's follow up examination on January 9, 201, Seeley "repeated his [January 8, 2016] instructions to Plaintiff." (*Id.*) The following day Plaintiff "was transported to UC San Diego Health System for post-op follow up." (*Id.* at 5.) Plaintiff alleges that the "transporting officers had not been apprised of the restrictions regarding transports" and as a result "Plaintiff suffered pain and discomfort in his right eye." (*Id.*)

On "multiple occasions," between January 8, 2016 and March 31, 2016, Plaintiff was "transported to and from [CEN] and UC San Diego Health System" and at "no time did Defendant Seeley inform transportation officials of Plaintiff's needs regarding transportation." (*Id.*) As a "direct consequence of Defendant Seeley's deliberate indifference," Plaintiff "suffered damage to his right eye which, according to UC San Diego Health System doctors necessitated the need for additional surgery." (*Id.*)

In March of 2016, Plaintiff "underwent surgery to repair retinal detachment." (*Id.*) Seeley again "was instructed by UC San Diego Health Systems surgeons to ensure adherence to transportation restrictions." (*Id.*) However, Plaintiff claims "Defendant Seeley failed to inform transportation officials of the transport restrictions." (*Id.*) As a result of this purported failure, "the March 2016 surgery was not successful." (*Id.* at 5-6.)

In June of 2016, Plaintiff "underwent a third surgery for retinal detachment." (*Id.* at 6.) Once again, Plaintiff claims "Defendant Seeley failed to inform transportation officials of the 2,000 feet elevation ceiling and face-down prone position restrictions." (*Id.*) Plaintiff alleges that as a "direct consequence of Defendant Seeley's willful failure to apprise transportation officials of Plaintiff's transportation restrictions, the June 2016 surgery was not successful." (*Id.*)

Since January of 2016, Plaintiff's "eye problems have been ongoing" and his "vision has deteriorated quite significantly." (*Id.*) Plaintiff alleges he was "informed by Dr. F. Von Lintig" that his "previous eye surgeries may very well have corrected his

vision problems if all transportation restrictions had been disseminated to transportation officials and adhered to during all transports." (*Id.*)

**III.    Defendant's Claims & Evidence**

    A.    Surgery performed on January 8, 2016

On January 8, 2016, Plaintiff had "eye surgery at the University of California, San Diego (UCSD)." (*See* Def.'s P&As, Declaration of Bennett Feinberg, M.D. in Supp. of Mot. for Summ. J., ECF No. 32-3 [hereafter "Feinberg Decl."], ¶ 6.) The primary surgeon was Dr. Henry Ferreyra and he was assisted by Dr. Ramkumar. (*See* Def.'s P&As, Declaration of Edward Wolfe in Supp. of Mot. for Summ. J., ECF No. 32-1, Ex. A, Dep. of Henry Ferreyra, M.D. [hereafter "Ferreyra Dep."] at 12:25-13:3.) Plaintiff "had blood in his eye, in the vitreous cavity" which was "due to proliferative diabetic retinopathy," as well as a cataract. (*Id.* at 12:15-18.) The purpose of the surgery was to "remove the blood, remove the cataract in order to perform the surgery" and "to treat the underlying proliferative diabetic retinopathy by doing laser." (*Id.* at 12:18-21.) During this surgery, "tears in the retina" had developed and "gas was placed in the eye to ensure the retina stayed attached." (*Id.* at 12:22-24.)

Following the surgery, Dr. Ramkumar prepared a "postoperative note" which included "instructions regarding medications, use of eye protection, remaining face down for three days, and returning to UCSD for a follow-up on January 19, 2016." (Feinberg Decl. at ¶ 10.) There were no "recommendations or instructions for Mr. Gallegos to stay below 2000 feet" in this note. (*Id.*) In addition, an "After Visit Summary" was printed by UCSD which provided "post-operative instructions on medications, follow-up appointments, symptoms to watch for, and care of affected area." (*Id.* at ¶ 9.) These instructions also included "wearing eye protection for 21 days, wearing a patch on the right eye while sleeping, remaining face-down for 23 hours per day until January 11, 2016 at 8:00 a.m., and not flying or going higher than 2000 elevation." (*Id.*)

The purpose for the instruction regarding altitude was due to the gas put in Plaintiff's eye could "expand" causing the "pressure in the eye to increase." (Ferreyra

Dep. at 18:16-19:6.) "If the bubble expands very acutely, it locks the circulation in the eye" which can cause "an infarct of the retina" and "irreversibly damage the retina." (*Id.* at 19:21-25.) According to Dr. Ferreyra, the policy at UCSD is to recommend against going above 4,000 feet in elevation and the 2,000 feet recommendation is "very, very conservative." (*Id.* at 19:7-11.)

Following the surgery Plaintiff returned to CEN. (*See* Feinberg Decl. at ¶ 11.) Plaintiff was seen by "RN N. Salcido in the Triage and Treatment Area (TTA)." (*Id.*) Salcido "noted" that Plaintiff "was wearing an eye patch and that the dressing was clean, dry, and intact and no drainage noted." (*Id.*) Salcido "documented discussing with [Plaintiff] changes to eye drop prescriptions and the need to report [any] visual changes or other worrisome symptoms immediately." (*Id.*) Salcido informed Plaintiff to return to the TTA "for a follow-up in three days." (*Id.*)

Plaintiff "returned to the TTA for a follow-up on January 10, 2016." (Feinberg Decl. at ¶ 12.) Plaintiff "first san RN A. Jacques" who "reviewed" his medications and "noted that the dressing was clean, dry, and intact." (*Id.*) Jacques also noted that Plaintiff "reported he 'lays face down 23 hours out of the day.'" (*Id.*)

After Plaintiff was seen by Jacques, he was seen by Seeley "who documented that [Plaintiff] 'states he is being compliant' with the instruction to lie face down 23 hours per day and that [Plaintiff] is 'doing well.'" (*Id.* at ¶ 13.) Seeley was not Plaintiff's "primary care physician (PCP)" at CEN and played no role in his care prior to his January 8, 2016 surgery. (Def.'s P&As, Declaration of K. Seeley. in Supp. of Mot. for Summ. J., ECF No. 32-2 [hereafter "Seeley Decl."], ¶ 5.) Seeley "documented that [Plaintiff] had not received all of the eyedrops that had been ordered" and "performed an exam notable for some tearing of the right eye and some redness of the white in the eye" but "no blood was noted during an ophthalmoscopic exam." (Feinberg Decl. at ¶ 13.) Seeley informed Plaintiff of his plan which was for Plaintiff "to remain compliant with his eye care instructions, make sure [Plaintiff] received all of his eyedrops," and to follow up with his PCP and "ophthalmologist as scheduled." (*Id.*)

Plaintiff returned to UCSD on January 12, 2016 for a "follow up" examination. (*Id.* at ¶ 14.) According to the "notes from the follow-up" indicate that Plaintiff was "doing well," that he should continue his eye drops, and that he should return for another follow-up in one week." (*Id.*) The previous "postoperative instruction" for Plaintiff "to remain face down for three days ended on January 11, 2016" which was the day before he returned to UCSD. (*Id.* at ¶ 10.) Plaintiff returned to CEN where he was initially seen by "RN R. Moyron" who documented that Plaintiff "denied any pain, itching, draining, or blurry vision, and he had no complaints of discomfort." (*Id.* at ¶ 15.)

Plaintiff returned to UCSD on January 19, 2016 and was examined by an ophthalmologist. (*Id.* at ¶ 16.) This ophthalmologist's notes indicated that Plaintiff's "stable post op appearance, good low pressure." (*Id.*) It was recommended that Plaintiff "continue drops as is on form; do not travel greater > 2000 feet elevation without 1 hour rest every increase of 1000 feet." (*Id.*) "RN N. Salcido documented receiving these instructions on January 19, 2016." (*Id.*) Salcido also "documented that 'special transportation needs with discussed [with] specialty." (*Id.* at ¶ 17.) Specialty refers to the "department at a prison that schedules appointments with outside specialists, and coordinates transportation to these appointments with custody officers." (*Id.*)

Plaintiff followed up with his PCP, Dr. Darryl Bates, on January 24, 2016. (*See id.* at ¶ 18.) During this examination, Bates noted that Plaintiff was "stable and compliant with his medications and recovering as expected." (*Id.*) Plaintiff had another follow-up examination with Bates on January 31, 2016. (*See id.* at ¶ 19.) Bates again noted that Plaintiff was "stable and compliant with his medications and recovering as expected." (*Id.*)

Plaintiff was seen by an ophthalmologist at "California Retina Associates" on February 4, 2016 to "follow-up on [Plaintiff's] diabetic retinopathy." (*Id.* at ¶ 20.) A "comprehensive examination" was conducted by an ophthalmologist who "recommended a change in medications and follow-up in three months." (*Id.*) The "ophthalmologist's note was stamped 'received' by Dr. Seeley, who noted below 'f/u [follow-up] as

scheduled.'" (*Id.*)  Plaintiff returned to CEN and was seen by "RN A. Galvan in the TTA who documented that [Plaintiff] reported 'no pain/distress,' and noted the change in medication and scheduled follow-up." (*Id.*)

Plaintiff returned to UCSD on February 16, 2016 for a "follow-up." (*Id.* at ¶ 21.) The ophthalmologist "noted that [Plaintiff's] visual acuity was 'clearing up more and more each day.'" (*Id.*)  Also noted as "findings," included an "attached retina" and "stable postop exam with gas precluding full vision." (*Id.*)  Recommendations were made to change Plaintiff's medications and to have a "follow-up in six weeks" but there was "no need to follow up [with] Dr. Mani [California Retina Specialists] as we are following his diabetic retinopathy." (*Id.*)  These records were "stamped as received by Dr. Seeley on February 17, 2016 with a notation to follow-up as scheduled." (*Id.*)

Plaintiff "had a PCP visit on February 19, 2016 with Dr. Rogelio Ortega, who noted that [Plaintiff] had been followed closely by the UCSD ophthalmology clinic since his surgery," along with being seen by California Retina Specialists. (*Id.* at ¶ 22.) Ortega noted that "all ophthalmologists agreed [Plaintiff] had a stable postoperative examination." (*Id.*)  Plaintiff was later seen on another "PCP visit on February 28, 2016" with Bates who reported that Plaintiff informed him that "his vision was 100% for the 2/16/2016 UCSD retinal visit and approximately 2 days later he noticed the gas bubble began to shrink and not he has 20% of gas bubble left." (*Id.* at ¶ 23.)  Plaintiff further reported that he "feels there are 'black clouds covering the eye' and 'light is coming through.'" (*Id.*)  Plaintiff also informed Bates that he was "feeling frustrated with his progress." (*Id.*)   The following day, Bates "added an addendum to his progress note" indicating that he "spoke with Dr. Ortega and we agreed the patient's symptoms were worrisome." (*Id.* at ¶ 24.)  Bates then contacted UCSD and "scheduled the inmate/patient for a March 1, 2016 13:00 urgent appointment." (*Id.*)

On March 1, 2016, Plaintiff returned to UCSD for a "follow-up" and the "recommendation was for another surgery." (*Id.* at ¶ 25.)  Ortega "signed that he

received and reviewed the ophthalmology note" the following day and "submitted a request for services that day for the surgery." (*Id.*)

  B. Surgery performed on March 7, 2016

 Following the initial surgery, it was determined by an ophthalmologist that Plaintiff had a "hematogenous, retinal detachment." (Ferreyra Dep. at 24:19-13.) On March 7, 2016, Plaintiff had a "right eye vitrectomy at UCSD" that was performed by Dr. Ramkumar. (Feinberg Decl. at ¶ 26.) The surgery was necessary "due to development of retinal breaks" which could have been "reopened" following the initial surgery or "additional breaks could have formed as well." (Ferreyra Dep. at 25:6-25.) The "UCSD Health After Visit Summary advised [Plaintiff] to remain face down for 23 hours per day for five days." (Feinberg Decl. at ¶ 26.) The summary also noted that it was "OK to travel to high elevation." (*Id.*) During the second surgery, "silicone oil was placed in the eye." (Ferreyra Dep. at 23:4-7.) Silicon, unlike gas, does not "contract" with a change of pressure and thus, silicone oil "has no elevation restrictions." (*Id.* at 28:8-15.)

 When Plaintiff returned to CEN he was seen by "RN P. Perez" who "documented discussing with [Plaintiff] the instruction to remain in a prone position for 23 hours per day, and noted that a 5-day lay-in order had been given to specialty." (Feinberg Decl. at ¶ 27.) Ortega "signed the physician's orders for medication and the lay-in order." (*Id.*) The following day, Plaintiff "returned to the UCSD ophthalmology clinic for a follow-up." (*Id.* at ¶ 28.) The ophthalmologist noted a "stable exam," "recommended changes to his eye drops," follow-up exam and specifically noted "OK to go up mountains; face down x 1 week." (*Id.*)

 Plaintiff returned to CEN and was seen by Salcido in the TTA. (*Id.*) Salcido "documented discussing new medications" with Plaintiff. (*Id.*) The "ophthalmologist's report and consultation are stamped received by Dr. Seeley on March 9, 2016." (*Id.*)

 On March 15, 2016, Plaintiff returned to UCSD for a follow-up examination. (*See id.* at ¶ 29.) The ophthalmologist noted that Plaintiff was "doing better, [visual acuity] improved" and found that Plaintiff's "retina was attached." (*Id.*) The ophthalmologist

also "adjusted" Plaintiff's medications and "requested a four-week follow-up." (*Id.*) Plaintiff returned to CEN were he was seen by Moyron who noted that Plaintiff was "stable [with] no discomfort or issues reported" and he had "no [signs or symptoms] of distress at this time." (*Id.*) The ophthalmologist's report and consultation were "stamped received by Dr. Seeley on March 15, 2016." (*Id.*)

Plaintiff was examined by Dr. David Rohrdanz for a "PCP follow-up on March 18, 2016." (*Id.* at ¶ 30.) Dr. Rohrdanz "noted that [Plaintiff] had 'no complaints,' that his 'vision is blurry but expected," and Plaintiff would have a "follow-up with ophthalmology in a month." (*Id.*) Plaintiff was seen by Dr. Ortega on April 5, 2016. (*See id.* at ¶ 31.) Dr. Ortega noted that Plaintiff "had strict limitations to lie prone face down for 7 days which the patient followed" and further indicated that Plaintiff "reported his vision was improving." (*Id.*)

Plaintiff "returned to UCSD ophthalmology clinic on April 12, 2016 for a follow-up." (*Id.* at ¶ 32.) The ophthalmologist "noted that a repeat surgery could be considered, and that the prognosis was guarded." (*Id.*) Plaintiff's medications were "adjusted" and a follow-up appointment was scheduled. (*Id.*) Upon his return to CEN, Plaintiff was seen by Salcido who documented "discussing [Plaintiff's] medications, schedule of follow-up appointments, and instructions with him." (*Id.*) The "ophthalmologist's report and consultation notes are stamped received by Dr. Seeley on April 12, 2016." (*Id.*)

On April 22, 2016, Plaintiff was seen again by Dr. Rohradanz "for a PCP follow-up." (*Id.* at ¶ 33.) Dr. Rohradanz noted that Plaintiff informed him that the ophthalmologist "wasn't particularly happy with his progress, recheck 1 month, possible further surgery." (*Id.*) Plaintiff returned to the UCSD ophthalmology clinic on May 24, 2016 at which time the ophthalmologist noted that he "discussed with patient risks/benefits/complications of surgery including need for more surgery, no improvement of vision" and Plaintiff "wishes to try another surgery." (*Id.*) The "ophthalmologist's progress report is stamped as received by Dr. Seeley on May 25, 2016." (*Id.*)

C.     Surgery performed on June 10, 2016

Plaintiff was seen by Dr. Ortega on June 8, 2016 for a "PCP follow-up." (*Id.* at ¶ 35.) Dr. Ortega "summarized" Plaintiff's "eye surgery history and noted that an appointment was scheduled for a repeat surgery." (*Id.*) Plaintiff had a "third eye surgery at UCSD by Dr. Henry Ferreyra and Dr. Hema Ramkumar" on June 10, 2016. (*Id.* at ¶ 36.) Plaintiff had developed "another detachment" of his retina and the purpose of the surgery was to "reattach the retina by removing the scar tissue and relasering the breaks and putting oil back in the eye." (Ferreyra Dep. at 30:9-17.) The "postoperative notes" indicated that there was "no gas in the eye so no transport restrictions." (*Id.* at 31:10-16.)

When he returned to CEN, Plaintiff was seen by RN Dizon who "noted that [Plaintiff] was to 'stay in prone position face down with pillow as must as possible for 5 days." (Feinberg Decl. at ¶ 37.) Dizon also "documented extensive instructions given by Dr. Seeley on the evening of June 10, 2016, including that [Plaintiff] was to remain face-down for 23 hours per day for five days." (*Id.*)

Plaintiff was seen by Seeley on June 11, 2016 in the "TTA for a follow-up." (*Id.* at ¶ 38.) Seeley documented that his instructions were to "remain prone 23 out of the 24 hours a day for the next 5 days." (*Id.*) Plaintiff was seen at UCSD on June 21, 2016 for "the first follow-up" post surgery. (*Id.* at 39.) The ophthalmologist documented that Plaintiff reported "good compliance with face down" and that he was "doing well." (*Id.*) The ophthalmologist recommended that Plaintiff "sleep on his left side, that he change his medication regimen, and that he follow up four weeks later." (*Id.*)

On November 6, 2017, Plaintiff transferred from CEN to the California Institution for Men ("CIM"). (*See id.* at ¶ 40.)

## IV.     Defendant's Motion for Summary Judgment

### A.     Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

10

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

As the moving party, Defendant "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). He may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

While Plaintiff bears the burden of proof at trial, Defendant "need only prove that there is an absence of evidence to support [Plaintiff's] case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." *Id.* at 323.

If Defendant as the moving party meets his initial responsibility, the burden then shifts to Plaintiff to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the allegations or denials of his pleadings, but is instead required to tender evidence of specific facts in the form of

affidavits, and/or admissible discovery material, to support his contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

Plaintiff must also demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of his suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for him. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

Finally, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, if Plaintiff "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ...." Fed. R. Civ. P. 56(e)(2). Nor may the Court permit Plaintiff, as the opposing party, to rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249-50 (1986); *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("'[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'") (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996)) (brackets in original)).

B.   Defendant's Arguments

Seeley seeks summary judgment as to Plaintiff's Eighth Amendment medical care claims arguing: (1) there is no triable issue of material fact as to Plaintiff's claim for

deliberate indifference to serious medical needs; (2) there is no evidence in the record to establish that Dr. Seeley was aware of or consciously disregarded a serious risk to Plaintiff's health or medical needs; and (3) he is entitled to qualified immunity. (*See* Def.'s Mem. of P&As in Supp. of Mot. for Summ. J., ["P&As"], ECF No. 32 at 14-22.)

### C.    Plaintiff's Opposition

Plaintiff contends that Seeley is not entitled to summary judgment because Seeley was "aware of, but chose to ignore a serious risk to Plaintiff's health and specified medical transport needs" and there exists material factual disputes as to his Eighth Amendment claim.  (Opp'n, ECF No. 36 at 2, 12-17.)

### D.    Eighth Amendment deliberate indifference claims

Plaintiff alleges that his Eighth Amendment rights were violated when Seeley failed to "inform [CDCR] transportation officials of restrictions regarding Plaintiff's transport" following his first eye surgery which caused his surgery to fail.  (Compl. at 5.) Plaintiff claims that Seeley's failure to do so was "willful" and his actions have "contributed to lasting and permanent damage to Plaintiff's right eye."  (Opp'n at 10.)

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105.  "Medical" needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, the prisoner must point to evidence in the record from which a trier of fact might reasonably conclude that Defendant's medical treatment placed Plaintiff at risk of "objectively, sufficiently serious" harm and that Defendant had a "sufficiently culpable state of mind" when she either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted).  Thus, there is both an objective and a

subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

The objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

However, the subjective component requires the prisoner to also allege facts which show that the officials had the culpable mental state, which is "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). As stated above, "deliberate indifference" is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057.

E.    Discussion

As an initial matter, the Court notes that Seeley did not submit a separate statement of material facts as required by CivLR 7.1(f)(1). Therefore, the Court will address the arguments set forth by Defendant in his moving papers.

Based on the evidence in the record before it, and in light of the relevant law, the Court finds, for the reasons set forth below, that a genuine dispute exists as to whether Seeley was deliberately indifferent to Plaintiff's medical needs in violation of his Eighth

1   Amendment rights.  Therefore, Seeley is not entitled to summary judgment pursuant to

2   Fed. R. Civ. P. 56(a).

3       Seeley argues that "there is no evidence that Dr. Seeley was aware of and

4   deliberately ignored any excessive medical risk" to Plaintiff. (Def.'s P&As at 15.)  Here,

5   the material fact relates to whether Seeley was aware or should have been aware of the

6   altitude restrictions following Plaintiff's first surgery.  Seeley accepts "for sake of

7   argument, that adherence to altitude and positional restrictions is a serious medical need."

8   (*Id.*)  Thus, the issue is whether there is a genuine dispute of material fact as to whether

9   Seeley was deliberately indifferent to Plaintiff's serious medical need.

10      There is no evidence in the record that Seeley was aware of Plaintiff's surgery

11  prior to his examination of Plaintiff following his return to CEN after his first surgery on

12  January 8, 2016.  The dispute centers on Seeley's examination of Plaintiff following the

13  January 8, 2016 and whether he should have ensured Plaintiff's transportation on his

14  return to UCSD the following day in compliance with the January 8, 2016 discharge

15  instructions.

16      Seeley's argues he "at no time was [he] ever [Plaintiff's] primary care physician."

17  (Seeley Decl. at ¶ 5.)  The Court agrees with Plaintiff's rebuttal that whether he was

18  Plaintiff's primary care physician or the "physician on duty" the day Plaintiff was

19  examined in the TTA following his surgery is irrelevant.  Seeley declares that his "role in

20  conducting the post-operative examination in the TTA was to evaluate [Plaintiff] for any

21  emergent or acute needs before his scheduled follow-ups with his PCP and treating

22  ophthalmologists at UCSD."  (*Id* at ¶ 7.)  In this case, it is undisputed that Plaintiff

23  returned to UCSD the day following this examination and there is no evidence he was

24  seen by his primary care physician, or given the opportunity to see his primary care

25  physician, prior to his return to UCSD.  Seeley fails to explain why his role as the "on

26  call" physician at the TTA would divest him of a standard of care purportedly required

27  only by a primary care physician.

28  / / /

Seeley argues that he could not have been "deliberately indifferent to the altitude restriction on trips" after he examined Plaintiff on January 8, 2016 because "there is no evidence that [Seeley] was aware [of] that restriction." (Def.'s P&As at 17.) In support of this argument, Seeley argues that the altitude restriction "does not appear on the ophthalmologist's post-operative instructions." (*Id.* citing Feinberg Decl. at ¶ 10.) In addition Seeley declares that he "only had access to those instructions that were scanned into the electronic file at the time of the examination." (Seeley Decl. at ¶ 7.)

Dr. Feinberg declared that in order to "form an opinion[2] in this matter," he reviewed, among other documents, Plaintiff's "Unit Health Record (UHR)." (Feinberg Decl. at ¶ 7.) Plaintiff's "UHR comprises medical records documenting the medical care provided" to Plaintiff. (*Id.*) In addition, "[p]ursuant to CDCR policies and procedures, those medical records are prepared at or near the time of the events recorded by staff with personal knowledge of the events recorded, and are stored and accessible" electronically. (*Id.*)

Dr. Feinberg notes that both the "Ophthalmology Operative Note electronically signed by Dr. Henry A. Ferreyra on January 8, 2016," as well as an "After Visit Summary form printed on January 8, 2016" were contained in Plaintiff's UHR. (*Id.* at ¶¶ 8-9.) The "After Visit Summary Form" provided "post-operative instructions on medications, follow-up appointments, symptoms to watch for, and care of the affected area." (*Id.* at ¶ 9.) This form included instructions for Plaintiff to remain "face-down for 23 hours per day until January 11, 2016 at 8:00 a.m., and not flying or going higher than 2000 feet elevation." (*Id.*)

/ / /

_____

[2] Notably, while Dr. Feinberg declares that he was "asked to opine in regard to the complaint by [Plaintiff] against [Seely], Dr. Feinberg does not, in fact, offer any opinion with regard to whether or not Seeley was deliberately indifferent to Plaintiff's serious medical needs or if he fell below the applicable standard of care in treating Plaintiff. His declaration mainly consists of a summary of the relevant entries in Plaintiff's UHR.

Seeley declares that the "absence of documentation in the Medical Progress Note [prepared by Seeley] indicates that I was not aware of [the altitude] restriction at the time" of Plaintiff's post surgery examination on January 8, 2016. (Seeley Decl. at ¶ 7.) However, he further declares, without evidentiary support, that these "instructions," including the altitude restriction, were "not in the electronic file." (*Id.*) However, Dr. Feinberg declares that this document was in Plaintiff's UHR which is "stored and accessible" electronically. (Feinberg Decl. at ¶ 7.) Moreover, in his declaration, Plaintiff declares that when he was seen in the TTA following his surgery on January 8, 2016, Nurse Salcido "reviewed [Plaintiff's] postoperative and *discharge instructions*, informed Dr. K. Keeley of their contents" and scheduled him for a "follow-up in the TTA." (Pl.'s Decl., ECF No. 36 at 33) (emphasis added.)   Therefore, there is a genuine dispute of material fact as to whether these discharge instructions were contained in Plaintiff's medical file at the time he was examined by Seeley on January 8, 2016.

Plaintiff argues that it was Seeley's responsibility as the "on-duty TTA physician" to comply with the "California Correctional Health Care Services (CCHCS) manual" to apprise "all appropriate facility departments, transportation and housing in particular," regarding "all accommodation orders via Comprehensive Accommodation Chronos." (Opp'n at 22-23.)  In response, Seeley argues that even if he "had a duty under CCHCS policies and procedures to prepare an accommodation chrono, it would be insufficient to establish a Constitutional violation." (Def.'s Reply at 4 citing *Mitchell v. Beard,* No. 1:17-cv-01032-SAB, 2017 WL 3620112, at *7 (E.D. Cal. Aug. 23, 2017) (finding that the "mere violation of a prison rule or regulation does not necessarily establish a constitutional violation").)

However, Plaintiff is not seeking to hold Seeley liable for violation of these policies but rather to support his claim that it was the alleged failure to Seeley to abide by these policies that caused the purported failure to provide him with accommodations for his serious medical needs. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993).

/ / /

Seeley further argues that there is no evidence that Plaintiff "would have had any better medical outcomes if Dr. Seeley had done anything differently." (Def.'s P&As at 18.) He maintains that "[n]one of the medical records contain any opinion or suggestion [Plaintiff] suffered any adverse effects or that any subsequent surgeries were necessitated as a result of not following these restrictions." (*Id.*)

Seeley states that Dr. Ferreyra, without citation, "opines that travel above 2,000 feet and failing to remain prone likely did *not* contribute to [Plaintiff's recurring retinal detachment or cause the surgeries to fail." (*Id.* at 18-19.) However, this is not an entirely accurate depiction of Dr. Ferreyra's deposition. The relevant portions of his deposition are as follows:

"Q:   Based on the review of the documents today, did you see any evidence of the type of damage to the eye that would result from traveling above 4,000 feet?
A:    I did not. But this particular case is confounded by the fact that he also had scar tissue. So if he would have had an outcome in which scar tissue didn't develop and the retina healed, the level of vision that was recorded and described in some of these notes could be attributable to damage from pressure. But when somebody develops redetachment, scar tissue of this severity, that alone can also lead to drop in vision. Based on what I'm seeing, it's really impossible to attribute vision loss to one process versus the other . . .
Q:    Okay.
A.    . . . without looking at specifics."

(Opp'n, ECF No. 36 at 62, Ferreyra Dep. at 43:8-23.)

Ferreyra also testified as follows:

"Q:   Okay, but in this case, are you able to say one way or the other, to a reasonable degree of medical certainty, whether the transportation caused or contributed to Mr. Gallego's need for a second or third surgery?
A:    Yeah. So for the need for a second and third surgery, I don't believe - - I do have an opinion. I don't believe they're related to air travel - - or to the travel above 4,000 fee. What I don't know, *and this is relevant*, is what is the highest elevation that the plaintiff had to travel in order to return to the facility. So I don't have the specific information."

(Ferreyra Dep., ECF No. 32-1 at 36:6-17.)

Ferreyra does not provide a definitive opinion and he indicates this by testifying that he does not have all relevant information to form an opinion. Moreover, Ferreyra does attest that altitude instructions are given post surgery in these types of cases because "if you go up in elevation, the atmospheric pressure decreases and the volume of the gas [placed in the eye during surgery] expands, which causes the pressure of the eye to increase." (*Id.* at 19:2-6.) The instruction is to "protect the eye" and the pressure can cause "an infarct of the retina, so it can irreversibly damage the retina." (*Id.* at 19:21-25.)

Seeley, as the moving party, "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144*, 627 F.3d at 387. Seeley's offer of Dr. Ferreyra testimony indicates that there was a rationale for the altitude post-operative instruction and the rationale was to prevent further injury to the eye. Considering the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has met his burden to show there is a triable issue of genuine issue of material fact as to whether the failure to comply with the discharge instructions caused him harm.

Based on all the above, the Court finds that there is a genuine issue of disputed material fact to support Plaintiff's claim that Seeley acted with deliberate indifference in his treatment of his medical condition. *See Farmer*, 511 U.S. at 834.

## V. Qualified Immunity

Finally, Defendant moves for summary judgment as to Plaintiff's Eighth Amendment claim on the ground that he is entitled to qualified immunity. (Def's P&As at 16-17.)

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to Plaintiff, demonstrate that the Defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was

"clearly established" at the time it is alleged to have been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although *Saucier* originally required the Court to answer these questions in order, the U.S. Supreme Court has since held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

If the Court finds that Plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Similarly, if the Court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity without determining whether the allegations in fact make out a statutory or constitutional violation. *Pearson*, 555 U.S. at 236-37.

As noted above, genuine disputes of material fact exist as to whether Defendant Seeley violated Plaintiff's Eighth Amendment rights. If Plaintiff's claims are presumed true, this evidence could establish that Defendant Seeley was deliberately indifferent to Plaintiff's serious medical needs. *See Jeffers*, 267 F.3d at 907 (citing *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998)). Thus, "the next . . . step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.

A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. However, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons,* __ U.S. __, 139 S.Ct. 500, 503 (2019). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kinsela v. Hughes*, 584 U.S. __, 138 S.Ct. 1148, 1152 (2018).

Here, in 2006, the Ninth Circuit noted that evidence of "aftercare instructions" in a prisoner's medical file entitles that prisoner to the "inference" that the prison doctor was "aware" of the "aftercare instructions in his medical record." *Jett v. Penner*, 439 F.3d

1091, 1097 (9th Cir. 2006). In the matter before this Court, Seeley's expert witness attests that the discharge instructions following Plaintiff's first surgery are contained in his medical records. (Feinberg Decl. at ¶ 7.) The Ninth Circuit has also held that a prison doctor's decision to transport an inmate by airplane, causing plaintiff to suffer medical complications, in direct contradictions to the plaintiff's treating physician's medical recommendations could constitute "deliberate indifferent to his medical needs." *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992).

Accordingly, viewing the facts in the light most favorable to Plaintiff, the Court finds Plaintiff has sufficiently produced evidence to satisfy both prongs of the qualified immunity analysis as to Seeley. Therefore, Seeley's Motion for Summary Judgment on qualified immunity grounds is DENIED.

## V. Conclusion and Order

In light of the above, the Court **DENIES** Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a) (ECF No. 32.)

**IT IS SO ORDERED**.

Dated: January 27, 2020

Hon. John A. Houston
United States District Judge

3:18-cv-01322-JAH-MSB