UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO GALLEGOS, CDCR #T-63165,<br><br>　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>K. SEELEY, M..D.,<br><br>　　　　　　　　　　Defendant. | Case No.:  3:18-cv-01322-JAH-MSB<br><br>**ORDER DENYING DEFENDANT SEELEY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO** Fed. R. Civ. P. 56<br><br>**[ECF No. 58]** |

　　　Currently before the Court is Defendant K. Seeley's ("Seeley") second Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 (ECF No. 58).  Alejandro Gallegos ("Gallegos") has filed an Opposition to this Motion to which Seeley has filed a Reply (ECF Nos. 60, 61).

　　　While the Motion was initially calendared before Magistrate Judge Michael S. Berg, the Court has determined that this Motion is suitable for disposition upon the papers without oral argument and that no Report and Recommendation from Magistrate Judge Berg is necessary.

/ / /

/ / /

For the reasons explained, the Court **DENIES** Seeley's Motion for Summary Judgment (ECF 58.)

## I. Procedural Background[1]

On June 18, 2018, Gallegos filed a Complaint under 42 U.S.C. § 1983 alleging that Seeley violated his Eighth Amendment right to adequate medical care when he was previously incarcerated at Centinela State Prison ("CEN") in 2016. (*See* ECF No. 1.) On July 17, 2018, the Court granted Gallegos leave to proceed in forma pauperis ("IFP"), screened his Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A, and directed U.S. Marshal service on his behalf. (*See* ECF No. 3.) Seeley filed an Answer to Gallegos' Complaint on October 11, 2018. (*See* ECF No. 7.)

Seeley filed his first Motion for Summary Judgment on October 9, 2019. (*See* ECF No. 32.) On January 27, 2020, the Court DENIED Seeley's Motion. (*See* ECF No. 40.) While Gallegos initially was proceeding *pro se*, he is now represented by Counsel. (*See* ECF No. 53.) On August 26, 2020, the Court granted the parties leave to file a second Motion for Summary Judgment. (*See* ECF No. 50.) On April 19, 2021, Seeley filed his second Motion for Summary Judgment. (*See* ECF No. 58.)

## II. Plaintiff's Claims & Evidence[2]

In 2016, Gallegos was housed at Centinela State Prison ("CEN"). (*See* ECF No. 1 at 4.) Gallegos "suffered from proliferative diabetic retinopathy with a non-clearing hemorrhage in his right eye." (*Id.*) Gallegos claims he also was diagnosed with a "visually significant cataract that decreased his vision and precluded a view to the posterior segment." (*Id.*)

Gallegos was "scheduled for cataract extraction by phacoemulsification with intraocular lens implantation" in his right eye. (*Id.*) Gallegos "underwent eye surgery"

---

[1] Page numbers for all documents filed in the Court's Case Management/Electronic Case File ("CM/ECF") will refer to the pagination generated by CM/ECF as indicated on the top right-hand corner of each chronologically-numbered docket entry.

[2] These allegations are those set forth in Plaintiff's Complaint.

on January 8, 2016 at the "UC San Diego Health System." (*Id.*) "Following surgery, Gallegos was returned to [CEN]." (*Id.*)

Two days after his surgery, as he was being "processed" through the CEN "Triage and Treatment Area (TTA)", Gallegos was "informed by health care staff that, pursuant to instructions and orders of Dr. K. Seeley, Gallegos was to maintain a face down position for the next three days." (*Id.*) In addition, Gallegos was "informed that, per directions of Dr. Seeley, any and all future transports between [CEN] and the UC San Diego Health System were to be made in such a manner that an altitude of 2,000 feet would not be exceeded." (*Id.*) If these instructions were not followed, it "could result in the surgery not being successful." (*Id.*)

During Plaintiff's follow up examination on January 9, 2016, Seeley "repeated his [January 8, 2016] instructions to Plaintiff." (*Id.*) The following day Gallegos "was transported to UC San Diego Health System for post-op follow up." (*Id.* at 5.) Gallegos alleges that the "transporting officers had not been apprised of the restrictions regarding transports" and as a result "Plaintiff suffered pain and discomfort in his right eye." (*Id.*)

On "multiple occasions," between January 8, 2016 and March 31, 2016, Gallegos was "transported to and from [CEN] and UC San Diego Health System" and at "no time did Defendant Seeley inform transportation officials of Plaintiff's needs regarding transportation." (*Id.*) As a "direct consequence of Defendant Seeley's deliberate indifference," Gallegos "suffered damage to his right eye which, according to UC San Diego Health System doctors necessitated the need for additional surgery." (*Id.*)

In March of 2016, Gallegos "underwent surgery to repair retinal detachment." (*Id.*) Seeley again "was instructed by UC San Diego Health Systems surgeons to ensure adherence to transportation restrictions." (*Id.*) However, Gallegos claims "Defendant Seeley failed to inform transportation officials of the transport restrictions." (*Id.*) As a result of this purported failure, "the March 2016 surgery was not successful." (*Id.* at 5-6.)

In June of 2016, Gallegos "underwent a third surgery for retinal detachment." (*Id.* at 6.) Once again, Gallegos claims "Defendant Seeley failed to inform transportation

officials of the 2,000 feet elevation ceiling and face-down prone position restrictions." (*Id.*) Gallegos alleges that as a "direct consequence of Defendant Seeley's willful failure to apprise transportation officials of Plaintiff's transportation restrictions, the June 2016 surgery was not successful." (*Id.*)

Since January of 2016, Plaintiff's "eye problems have been ongoing" and his "vision has deteriorated quite significantly." (*Id.*) Gallegos alleges he was "informed by Dr. F. Von Lintig" that his "previous eye surgeries may very well have corrected his vision problems if all transportation restrictions had been disseminated to transportation officials and adhered to during all transports." (*Id.*)

### III. Defendant's Claims & Evidence

On January 8, 2016, Gallegos had surgery at UCSD to "remove a vitreous hemorrhage in [Gallego's] right eye, remove a cataract, and treat underlying proliferative diabetic retinopathy." (ECF No. 58-6 at 2.) Proliferative diabetic retinopathy is a "condition in which new blood vessels grow in a patient's retina after existing blood vessels have become compromised due to diabetes." (*Id.*) These new blood vessels "may have adverse consequences, including vitreous hemorrhaging, which is when the vessels leak blood into the clear vitreous jelly that fills the eye" and "can obstruct vision." (*Id.*)

During Gallego's surgery, "vitreous jelly, including blood from the vitreous hemorrhaging, was removed from [Gallego's] right eye" and "[d]uring this process, breaks developed in [Gallego's] retina." (ECF No. 58-6 at 3.) These "breaks were repaired by laser, and the eye was filled with C3F8 gas to replace the vitreous jelly that had been removed." (*Id.*) After the surgery, an "After Visit Summary" was prepared by UCSD that "included instructions to remove face-down for 23 hours per day until January 11, 2016, at 8:00 a.m. and not fly or go higher than 2,000 fee in elevation." (*Id.*) The "potential harm from failing to remove nose, face, or cheek down following surgery is that the patient may develop a cataract, or the retina may not heal properly without the pressure of being held against the back of the eye, and may detach." (*Id.* at 4.)

1     In addition, patients with "C3F8 gas placement are generally advised not to travel
2 to high altitudes" because as the "air pressure decreases, the C3F8 may expand, causing
3 pressure in the eye to increase." (*Id.*)  This increased pressure "could stop blood flow to
4 the eye" and depending on how long the blood flow is stopped, "tissue death (infarction)
5 could occur in the retina." (*Id.*)  The 2,000-foot elevation limit recommendation for
6 Gallegos "was conservative" and "[b]rief travel to 4,000 feet in elevation is generally safe
7 for dilute C3F8 gas placement." (*Id.*)  Following surgery Gallegos was "transported back
8 to Centinela on a route that went over mountains." (*Id.* at 4-5.)  The elevation between
9 UCSD and Centinela was between 4,000 and 4,100 feet at the highest point." (*See id.* at
10 5.)
11    Gallegos returned to Centinela on January 12, 2016 and returned to UCSD on
12 January 19, 2016 which included "travel over mountains." (*Id.*)  During his appointment,
13 Gallegos "discussed traveling over the mountains with his doctor" and when he returned
14 to Centinela he was "driven around the mountains." (*Id.*)  The note following this
15 examination indicated that Gallegos had a "stable post-op appearance, [and] good low
16 pressure." (*Id.*)
17    On February 4, 2016, Gallegos had an appointment with California Retinal
18 Associates. (*See id.* at 7.)  According to the notes following this visit indicated that
19 Gallegos' "retina was attached, stable, recovering appropriately, and [Gallegos's] vision
20 was improving." (*Id.*)  Gallegos had another appointment at UCSD on February 16, 2016
21 and the notes following this visit stated "VA [visual acuity] clearing up more and more
22 each day." (*Id.*)  On February 28, 2016, Gallegos "reported to Dr. Darryl Bates, a
23 physician at Centinela, that his vision was "100% at the 2/16/16 visit to UCSD, but two
24 days later, he noticed the gas bubble beginning to shrink, and he felt 'black clouds' were
25 covering his eye." (*Id.* at 7-8.)
26    Gallegos returned to UCSD on March 1, 2016 and it was "determined that he
27 required a second eye surgery." (*Id.* at 8.)  Gallegos "underwent a second surgery on his
28 right eye at UCSD on March 7, 2016" to "repair a retinal detachment in his right eye."

(*Id.*)  During the March 7, 2016 surgery, "significant pre-retinal membranes were identified and removed, and multiple breaks in the retina were repaired with a laser." (*Id.*)  Preretinal membranes are "aberrant growths in the retina" which "can distort the retina and cause retinal breaks." (*Id.*)

Gallegos "underwent a third eye surgery at UCSD on June 10, 2016 to repair a retinal detachment in his right eye." (*Id.*)  During this surgery, "extensive retinal bands and membranes were removed, and breaks in the retina were repaired with a laser." (*Id.* at 8-9.)  "Retinal bands are fibrous growths in the retina that result from diabetic retinopathy and may cause retinal breaks and retinal detachment." (*Id.* at 9.)

## IV.  Defendant's Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

As the moving party, Defendant "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). He may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

While Plaintiff bears the burden of proof at trial, Defendant "need only prove that

there is an absence of evidence to support [Plaintiff's] case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." *Id.* at 323.

If Defendant as the moving party meets his initial responsibility, the burden then shifts to Plaintiff to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the allegations or denials of his pleadings, but is instead required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, to support his contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

Plaintiff must also demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of his suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for him. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

Finally, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly." *Thomas v.*

*Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, if Plaintiff "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ...." Fed. R. Civ. P. 56(e)(2). Nor may the Court permit Plaintiff, as the opposing party, to rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249-50 (1986); *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("'[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'") (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996)) (brackets in original)).

### B. Defendant's Argument

Seeley seeks summary judgment as to Gallego's Eighth Amendment medical care claims on the ground that "there is no genuine dispute of material fact as to the cause of [Gallego's] harm." (ECF No. 58-5 at 5.) However, Gallegos contends that Seeley is not entitled to summary judgment because there is a "triable issue of material fact that Plaintiff's inability to adhere to the positional and altitude restrictions caused Plaintiff's harm." (ECF No. 60 at 2.)

### C. Objection to Expert Paulson

First, Seeley argues Gallego's designated expert witness, Reed Paulson, M.D, expert testimony opinion on causation is inadmissible pursuant to Federal Rule of Evidence 702. (ECF No. 58-5.) Seeley states that Dr. Paulson is a "correctional medicine expert," board certified in "family medicine, pediatrics, and emergency medicine" and "not an ophthalmologist." (*Id.*) Thus, Seeley argues Dr. Paulson is "not qualified to offer expert testimony on causation in a complex medical issue outside his area of specialty." (*Id.*)

However, as Gallegos points out in his Opposition, the only expert witness Seeley

1  put forward to establish alleged lack of causation in support of his first Motion for
2  Summary Judgment was Dr. Bennett Feinberg who also is a correctional medical expert
3  and not an ophthalmologist. (ECF No. 32-3.) Dr. Feinberg is "board certified in internal
4  medicine" and the "Chief Medical Consultant for the California Correctional Health Care
5  Services (CCHCS) Office of Legal Affairs." (ECF No. 32-3 at 1-2.)

6      Seeley argues in his Reply to Gallego's Opposition "Dr. Feinberg has not
7  presented an opinion on causation in this case" and "[h]e is not qualified to do so because
8  he is not an ophthalmologist." (ECF No. 61 at 9.) However, in the pending Motion for
9  Summary Judgment, Seeley has submitted his "Second Expert Designation" which has a
10 date signed by Seeley's Counsel of February 8, 2021. (ECF No. 58-4 at 4-8.) In this
11 expert designation, it is stated that Dr. Feinberg remains an expert witness on behalf of
12 Seeley and will be providing "expert medical opinions and testimony regarding the nature
13 of Plaintiff's medical conditions, diagnoses, and procedures, the medical purposes of
14 travel restrictions, and the <u>causation of Plaintiff's alleged injuries</u>." (*Id.* at 5) (emphasis
15 added). Despite Seeley's argument that there is "nothing inconsistent . . . about Dr.
16 Seeley's objection to Dr. Paulson's proffered opinions on causation," it appears to the
17 Court that there is very much an inconsistency in positions taken by Seeley with regard to
18 this argument.

19      Seeley also argues that Dr. Paulson's opinions are inadmissible because his Rule
20 26(a)(2) report "does not contain any opinion on causation, and he has not disclosed any
21 supplemental or rebuttal reports." (ECF No. 58-5.) However, it appears that any opinion
22 with regard to causation by Dr. Paulson were solicited through questions by Seeley's
23 Counsel during Dr. Paulson's deposition testimony. (ECF No. 60-5 at 8-9.)

24      Defense Counsel:
25  Q:  Are you able to say to a reasonable degree of medical certainty that Mr. Gallegos inability to remain prone for 23 to 24 hours after his January 8, 2016 surgery caused the subsequent retinal detachment?
26
27  Dr. Paulson:
    A:  It gave the opportunity for that.
28 (*Id.* at 8.)

> Q: I understand there's the opportunity for that injury to arise, but do you have an opinion in this case about whether, in fact, Mr. Gallegos suffered that particular harm as a result of not remaining facedown for 23 to 24 hours after his January 8th, 2016 surgery?
> A: It increased the risk for it, which meant that it was not absolutely.
> Q: I'm sorry. What do you mean it was not absolutely?
> A: It was not absolutely the cause but certainly increased the risk for it and could be causal.
> Q: When you say it was not absolutely the case, do you have an opinion about what was the cause of Mr. Gallego's retinal detachment was? In other words, do you have any opinion as to any other contributing factors?
> A: I don't know of any other contributing factors, other than the normal operative risks. I don't know of any other trauma that he might have or circumstances. There's nothing in the records that indicate anything else.

(*Id.* at 8-9.)

In his report, Dr. Paulson states "[d]ue to Dr. Seeley's negligence and deliberate indifference to Mr. Gallego's serious medical needs, Mr. Gallegos was unnecessarily forced out of his healing/prone position for more than the 1 hour allowed in 24 hours and exposed to the ocular barotrauma of travel up and down over a greater than 4,000-foot mountain pass 4 times." (ECF No. 58-4 at 57.) Dr. Paulson goes on to state in his report that this inaction on the part of Seeley was "against the specific medical direction of the ophthalmologic surgeon for Mr. Gallegos" and as a result, "Dr. Seeley is responsible for any and all of the harms and suffering secondary to these exposures." (*Id.*)

Under the Federal Rules, "[t]he purpose of these [expert] reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion ... so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. Aug. 30, 2010) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)).[3] The Federal Rules " 'do[ ] not limit an expert's testimony simply to

---

[3] A review of Dr. Maggiano's expert witness report, *see* ECF No. 58-4 at 32-26, indicates that Dr. Maggiano only expresses one opinion. Specifically, Dr. Maggiano states "[i]t is my opinion that the

reading his report.... The rule[s] contemplate that the expert will supplement, elaborate upon, [and] explain his report' in his oral testimony." *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167, 168 (D.C. Cir. 2007) (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)).

Here, Counsel for Seeley was able to seek clarification of the basis for Dr. Paulson's opinion in his deposition testimony. Accordingly, for all the reasons set forth above, the Court OVERRRULES Seeley's objection to Dr. Paulson's expert witness testimony.

E. <u>Eighth Amendment deliberate indifference claims</u>

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105. "Medical" needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, the prisoner must point to evidence in the record from which a trier of fact might reasonably conclude that Defendant's medical treatment placed Plaintiff at risk of "objectively, sufficiently serious" harm and that Defendant had a "sufficiently culpable state of mind" when she either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth

---

additional June 2018 surgery as well as the primary surgery of 1/8/16 and those of March and June 2016 were appropriately treated." (*Id.* at 35.) However, Dr. Maggiano's Declaration in support of Defendant's Motion for Summary Judgment contains several opinions not specifically set forth in his expert report.

Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

The objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

However, the subjective component requires the prisoner to also allege facts which show that the officials had the culpable mental state, which is "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). As stated above, "deliberate indifference" is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057.

F.   Discussion

Seeley argues that he has presented "expert testimony that [Gallegos's] inability to follow post-surgical recommendations did not cause his alleged harm" and is entitled to summary judgment. (ECF No. 58-5 at 10.)  Gallegos, however, argues that there is a "triable issue of material fact that Plaintiff's inability to adhere to the positional and altitude restrictions caused Plaintiff's harm." (ECF No. 60 at 4.)

Based on the evidence in the record before it, and in light of the relevant law, the Court finds, for the reasons set forth below, that a genuine dispute exists as to whether Seeley was deliberately indifferent to Gallegos's medical needs in violation of his Eighth

Amendment rights. Therefore, Seeley is not entitled to summary judgment pursuant to Fed. R. Civ. P. 56(a).

In Seeley's original Motion for Summary Judgment he accepted "for sake of argument, that adherence to altitude and positional restrictions is a serious medical need." (ECF No. 32-15.) Thus, the issue is whether there is a genuine dispute of material fact as to whether Seeley was deliberately indifferent to Plaintiff's serious medical need.

It is undisputed by both parties that after the January 8, 2016 surgery, "an After Visit Summary was prepared by UCSD that included instructions to [have Gallegos] remain face-down for 23 hours per day until January 11, 2016, at 8:00 a.m." (ECF No. 61-1 at 4.) It is also undisputed by both parties that patients "with C3F8 gas placed in the eye are generally advised to remain nose, face, or cheek-down for a time following surgery." (*Id.* at 4.) It is further undisputed that this "recommendation is for two purposes: to keep the gas away from the front of the eye, where it may cause a cataract, and to hold the retina against the back of the eye as it heals from the surgery." (*Id.* at 5.)

Seeley argues that there is "no evidence that failing to maintain prone in the three days following his January 8, 2016 surgery caused [Gallegos] any harm." (ECF No. 58-5 at 11.) Seeley maintains that Gallegos "had proliferative fibrous growth in his right eye arising from his underlying diabetic retinopathy." (*Id.*) Specifically, Dr. Maggiano, in support of Seeley's Motion, declares that the "records for Mr. Gallego's March 7, 2016 and June 10, 2016, surgery show that he was experiencing proliferative fibrous growth in his right eye." (ECF No. 58-1 at 5.) Dr. Maggiano also states that "such growth is related to Mr. Gallego's underlying diabetic retinopathy and is in no way related to whether he maintained recommended positioning after his January 8, 2016, surgery." (*Id.*)

However, in his report, Dr. Maggiano only states that he did not "believe that the failure of transport officials to allow for a face down position contributed to the long-term downward course of this patient's severe retinal disease" or that the "short period of time that his face may not have been down during the transport back to the Centinela State

prison did not alter the course of his right diabetic eye disease." (ECF No. 58-4 at 35.) This report does not actually opine whether the failure to comply with the instruction for positioning for three days following his return to Centinela "is in no way related" to the Gallegos's retina becoming detached.

Dr. Ferreya testified that the three-day positioning order following surgery in this matter was "in order to allow the laser to form an adhesion so that ultimately, when the gas is absorbed, which is what eventually happens, there's a complete adhesion around the breaks, and the retina doesn't redetach because the break wasn't sealed." (ECF No. 60-2 at 9.)  Gallegos argues that Dr. Maggiano "provides no opinion that the gas bubble need or need not remain in place to ensure that the laser forms an adhesion to allow the retinal breaks to fully heal and ultimately prevent recurrent detachment." (ECF No. 60 at 7.)

Dr. Maggiano bases his opinion, in part, on his assessment that at "multiple appointments between January 12, 2016 and February 16, 2016" Gallego's "retina was observed to be attached and secure, and his vision improving." (ECF No. 58-1 at 6.)  However, the record before the Court does not necessarily support these conclusions.  On January 11, 2016, it was noted by Seeley that Gallegos reported "some difficulties with vision." (ECF No. 58-4 at 104.)  On February 4, 2016, notes written by a physician at his appointment with California Retina Associates indicated Gallegos complained of redness, burning, itching, floaters (spots), vision distortion, and wavy lines. (*Id.* at 114.)  Gallegos also described the severity of these symptoms as "moderate." (*Id.*)   These documents would appear to raise a triable issue of material fact as to whether Gallego's vision was "improving" following the purported failure to provide Gallegos the ability to comply with the post operational instructions to remain prone for twenty-three hours a day and failing to adhere to altitude restrictions following the January 8, 2016 surgery.  The Court also finds that Dr. Maggiano's opinions in his declaration are not directly in line with his opinions in his expert report.  Moreover, Dr. Maggiano and Dr. Ferreya's opinions differ to the extent that it necessarily raises a triable issue of material fact as to whether

Seeley's purported failure to comply with Gallego's post-operative instructions to remain prone following surgery caused Gallego's later injuries and loss of vision. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")

In addition, Dr. Paulson's report states "[d]ue to Dr. Seeley's negligence and deliberate indifference to Mr. Gallego's serious medical needs, Mr. Gallegos was unnecessarily forced out of his healing/prone position for more than the 1 hour allowed in 24 hours and exposed to the ocular barotrauma of travel up and down over a greater than 4,000-foot mountain pass 4 times." (ECF No. 58-4 at 57.) Dr. Paulson goes on to opine that this inaction on the part of Seeley was "against the specific medical direction of the ophthalmologic surgeon for Mr. Gallegos" and as a result, "Dr. Seeley is responsible for any and all of the harms and suffering secondary to these exposures." (*Id.*)

Seeley also moves for summary judgment on the grounds that the trips Gallegos took to and from UCSD for his surgery that exceeded the elevation restriction following his January 8, 2016 were "unrelated to the complications that required Mr. Gallegos to have later surgeries and suffer long-term loss." (ECF No. 58-5 at 12.)

Neither party disputes that after the January 8, 2016 surgery, UCSD issued post-operative instructions that included the direction that Gallegos "must <u>not</u> fly or go higher than 2000 feet in elevation." (ECF No. 58-4 at 99.) It is also not disputed that "[p]atients with C3F8 gas placement are generally advised not to travel to high altitudes" because as "air pressure decreases, the C3F8 may expand, causing pressure in the eye to increase." (ECF No. 61-1 at 8.) The "increased pressure could stop blood flow to the eye" and if "stopped for long enough, tissue death (infarction could occur in the retina." (*Id.* at 8-9.) Despite these instructions, following the surgery Gallegos was "transported back to Centinela on a route that went over the mountains." (*Id.* at 10.) The elevation between UCSD and Centinela is between 4,000 and 4,100 feet. (*Id.* at 11.)

It is undisputed that Seeley could not have been aware of the travel elevation restrictions until he first saw Gallegos on January 10, 2016. However, Gallegos was

driven "between Centinela State Prison and San Diego" over mountains three more times after he was seen by Seeley. (ECF No. 58-5 at 12.) Dr. Maggiano opines that Gallego's "retinal detachment in late February 2016, and the complications that required additional subsequent surgery, were unrelated to his travel through mountains between January 8, 2016 and January 19, 2016." (ECF No. 58-1 at 6.) Dr. Maggiano bases this opinion on his findings that the "altitude Mr. Gallegos reached" was unlikely to "cause infarction," the ascent on the drive was "relatively slow compared to air travel," and the time Gallegos was above 4,000 feet was insufficient to cause tissue death." (*Id.*)

Dr. Maggiano also declares, as stated above, that Gallegos's "retina continued to recover appropriately, and his vision improved" following his January 8, 2016 surgery. (ECF No. 61-1 at 39.) However, Dr. Paulson testified that Gallegos suffered "barotrauma, because he was sent up those altitudes." (ECF No. 60-5 at 10.) Dr. Paulson also testified that the barotrauma Gallegos may have suffered could have been the "possible cause" of his "subsequent retinal detachment." (*Id.*)

Seeley, as the moving party, "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144*, 627 F.3d at 387. Here, both parties have submitted expert testimony that provide different reasons for the injuries suffered by Plaintiff. Regardless of whether Gallegos's underlying medical condition could have contributed to his injuries, a fact question exists as to whether the failure to comply with the post-operative instructions could have also caused Gallegos's injuries. Considering the facts in the light most favorable to Plaintiff, the Court finds that Gallegos has met his burden to show there is a triable issue of genuine issue of material fact as to whether the alleged failure by Seeley to comply with the post-operative instructions caused him harm.

Thus, based on all the above, the Court finds that there is a genuine issue of disputed material fact to support Plaintiff's claim that Seeley acted with deliberate indifference in his treatment of his medical condition and as a result, caused him further harm. *See Farmer*, 511 U.S. at 834.

IV. **Conclusion and Order**

In light of the above, the Court **DENIES** Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a) (ECF No. 58.)

**IT IS SO ORDERED**.

Dated: September 21, 2021

Hon. John A. Houston
United States District Judge